**B AMUSEMENT COMPANY, et al.**

v.

**UNITED STATES.**

No. Cong. 1–54.

United States Court of Claims.

Jan. 20, 1960.

Louis Kranitz, St. Joseph, Mo., for plaintiffs. Richard K. Lyon, Washington, D. C., was on the briefs.

Howard O. Sigmond, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., for defendant.

WHITAKER, Judge.

This case is before the court pursuant to H.R. Resolution No. 475, 83d Congress, 2d Session, by which the court has been requested to determine whether plaintiffs have a legal or equitable claim against the United States, and the amount, if any, legally and equitably due thereon, and to report its conclusions to the House.

Plaintiffs sue to recover property losses and damages sustained by them as a result of a flood on the Missouri River in the vicinity of Kickapoo Bend south

of St. Joseph, Missouri. The flood in question took place in March 1949 and resulted from the melting of an ice gorge which jammed the river in the vicinity of Iatan Bend. Plaintiffs' claims rest on the allegation that the ice gorge which caused the flood was in turn caused by certain pile dikes and revetments which had been negligently placed in the river by the Army Corps of Engineers for purposes of flood control and navigation.

The facts of the case show that the Missouri River in its natural state was a wide, meandering, braided stream which flowed through a flood plain or valley which varied in width from 2½ to 10 miles. The channel was composed of numerous, shallow, interlaced streams of varying width separated by bars and islands. By the Act of January 21, 1927 (44 Stat. 1010, 1013), Congress approved a plan for the improvement of the Missouri for purposes of navigation. By the acts of August 30, 1935 (49 Stat. 1028, 1034) and March 2, 1945 (59 Stat. 10, 19), the original plan was expanded and modified to provide for both a larger and deeper navigable channel as well as a plan for flood control.

To carry out these plans, it was necessary that the Corps of Engineers narrow and stabilize the river channel. This approach is the only one that is feasible on a river such as the Missouri. It is an alluvial stream and the only way it can be harnessed is to use its inherent qualities. Thus, the depth of the navigable channel is maintained by allowing the river to scour the bottom. To accomplish this, the width of the river is first narrowed and stabilized within the flood plain by the process of accretion. This is done by the location of pile or trail dikes placed parallel to the river bank and surrounded by rock fill. The river gradually deposits sediment around these dikes and thus creates an effective dam which forces the river down the designed channel and keeps it from meandering over the entire flood plain.

At the time of the flood in 1949, the designed channel, in the area in question, was composed of three bends which formed an ox yoke. The middle link is Iatan Bend joined upstream by Oak Mill Bend and below by Kickapoo Bend. Running off from Oak Mill Bend and Iatan Bend were two natural chutes or depressions, there before the Corps of Engineers started on the project, which tended to allow the river water to bypass the designed channel. These chutes were called Oak Mill Chute, which ran off on the Kansas side, and Iatan Chute, which bypassed the channel on the Missouri side. To contain the river within the design channel the Corps of Engineers placed pile dikes at the head of both Oak Mill and Iatan Chutes. At the time of the flood in the winter of 1948–1949 these dikes were not sufficiently high to dam off all of the water running into the chutes and some did bypass the design channel.

On the inner or Kansas side of Iatan Bend at approximately mile 422, there was a submerged pile structure, designated 437.3L. This structure had originally been designed to contain the channel existing prior to the flood of 1943. After that flood, the river changed its course. The engineers then adopted the new course, but this left structure 437.-3L, which was originally on the Missouri side, along the Kansas bank. The engineers saw no reason to remove the structure, but merely shortened it so that it protruded only a few feet into the new design channel, and not at all into the navigation portion of the channel. In this position, it supported the Kansas bank.

Along the outer side of Iatan Bend the engineers had constructed a long curving pile dike which paralleled the Missouri shore, which constricted the water, so that its scouring action produced the necessary depth for navigation. The 1948 hydrograph shows that there was a very good navigation channel proceeding around the bend ranging in depth from 6 to 26 feet.

The Missouri River has ice on it each year and this has been a factor in most of the early spring floods. In December 1948 the first ice block on the river was

observed between mile 476.5 and 478.5 approximately 50 miles up the river from Iatan Bend. By January 5, 1949 the ice had moved downstream and lodged at mile 421 on Iatan Bend at the point where Oak Mill Chute returns to the main channel. By January 8, the ice at mile 421 moved downstream, but it continued to hold fast immediately upstream at mile 422, approximately at the location of the submerged structure 437.3L. Ice continued to form in the river and by January 11, 1949 a block of ice extended from mile 421 to mile 434.5. There were also four other blocks of ice further upstream at this time. On January 15 and 16 various blocks of ice moved downstream and gorged at mile 422. This gorge held fast and by January 31 the ice had extended up the river for some 100 miles.

There was little movement of the ice gorge after this time until March. In February, the engineers made an effort to dislodge it with explosives, which proved unsuccessful. In late February, the weather warmed and the tributary streams began to thaw and rise, some even flooded. The Corps of Engineers issued flood warnings daily and advised all residents that when the ice moved out water levels would be unpredictable.

On March 6, 1949, at 3:45 a. m. the lower end of the ice from mile 422 to mile 428 went out; at 8:00 a. m. the block from mile 428 to 430 went out; and by 9:30 a. m. the rest of the long jam began to move. It was at this time that the flooding occurred on plaintiffs' properties.

Plaintiffs base their legal claims on two theories: first, that the flooding constituted a taking compensable under the Fifth Amendment; or, second, that the flooding was a tort, damages for which are allowable under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). In the alternative, the plaintiffs say that they are equitably entitled to recover, since the defendant's negligent construction and maintenance of the dikes and revetments at Iatan Bend were the proximate cause of the ice gorge and, consequently, of their injury.

■■ It seems clear from the record that plaintiffs do not have a legal claim against the United States. Certainly the defendant's actions do not constitute a taking under the Fifth Amendment. It is well settled that consequential damages form no basis for such a recovery. To constitute a taking there must be an intent on the part of the United States to take plaintiffs' properties, or, at least, an intention to do an act the natural consequences of which was to take the property. Here, however, the record clearly shows that the defendant's acts were designed to protect plaintiffs' private properties, not to take them; nor can it be said that the natural consequences of these acts would result in a taking of their properties for public use. Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608; Columbia Basin Orchard v. United States, 132 F. Supp. 707, 132 Ct.Cl. 445; Crites v. United States, 132 F.Supp. 469, 132 Ct.Cl. 544; Coates v. United States, 110 F.Supp. 471, 124 Ct.Cl. 806; Yazel v. United States, 93 F.Supp. 1000, 118 Ct.Cl. 59. One flooding does not constitute a taking and the plaintiffs have failed to show by their evidence that the flooding which occurred in 1949 will inevitably recur. This fact is essential to prove a taking. North Counties Hydro-Electric Co. v. United States, 151 F.Supp. 322, 138 Ct. Cl. 380.

■ Nor have plaintiffs a legal claim under a tort theory of recovery. In providing for a broad plan of flood control on the Mississippi River and its tributaries, of which the Missouri River is one, Congress specifically provided that "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C.A. § 702c. This long established policy of non-liability is bottomed on public policy and not sovereign immunity, but, at any rate, it is a withdrawal of consent to be sued in such cases, if it can be said that such

consent had previously been given. Grant v. Tennessee Valley Authority, D. C., 49 F.Supp. 564. We agree with the Eighth Circuit Court of Appeals that this section was not intended to be repealed by the enactment of the Federal Tort Claims Act. See National Mfg. Co. v. United States, 8 Cir., 210 F.2d 263, where the question is fully and ably discussed.

 We come, then, to the final question before the court, which is whether the plaintiffs have an equitable claim against the United States. The word "equity" in this context is used in the sense of broad moral responsibility, what the Government ought to do as a matter of good conscience. Georgia Kaolin Co. v. United States, Ct.Cl. No. Cong. 7–55, decided February 11, 1959; Gay Street Corp. v. United States, 127 F.Supp. 585, 130 Ct.Cl. 341. Under even this theory, however, defendant's liability must rest on some unjustified act or omission to act which caused plaintiffs' damage; otherwise any award would be a pure gratuity.

 In reviewing the record, we do not believe that it shows the defendant was at fault. The ice gorge at mile 422 was caused by many factors over which the defendant had no control. The combination of weather, water velocity, stream gauge, and wind all contributed substantially to the formation of the jam. The facts show that the normal daily discharge of water passed St. Joseph, Missouri, some 20 or so miles upstream, which normally amounted to some 36,000 cubic feet per second, had dropped to only 6,880 c.f.s. on January 3, 1949, due to ice on the tributaries, low rainfall, and other factors. This unusually small flow, not only made the river shallower than usual, but also greatly reduced its velocity. This fact alone substantially contributed to the gorge, since the shallower and slower the water, the easier it is for it to freeze.

The plaintiffs say that the defendant caused the ice jam because it did not remove structure 437.3L from its place on the inner bank of Iatan Bend. We dis-

agree. This structure did not cause the gorge. Its removal would not have prevented the inner bank of the bend from shoaling, which is inherent in an alluvial stream. The current being slow at the shoals, sediment is continually deposited and when the ice comes down the river it catches on these shoals and might create a jam, whereas swift water carries the ice on down the stream. This shoaling was, without doubt, one of the causes of the gorge, and there would have been shoaling at this point even if the defendant's structure 437.3L had been entirely removed.

Nor do we believe that the plaintiffs can complain because the pile dikes across the head of Oak Mill and Iatan Chutes did not completely block the flow of water into these old channels. The only practical way these channels could be effectively blocked was through the slow process of accretion, without incurring prohibitive expense. The defendant was not negligent because the river had not deposited enough sediment to form a dam.

 Basically, plaintiffs' claims are bottomed on the theory that, if the defendant had made no effort to improve navigation and flood control on the Missouri, the ice would not have gorged in the particular spot that it did on Iatan Bend. This may or may not be true. However, we do not believe it is relevant. The United States has a constitutional right, even a duty, to improve navigation and protect against floods, for the benefit of all of its citizens who are affected thereby. To say that, if it does enter into plans of improvement, it will stand liable for damage regardless of negligence would be an absurd rule, and one contrary to the expressed will of Congress embodied in the provision quoted above, 33 U.S.C.A. § 702c. The general welfare of its citizens demands the Government's participation in these navigation and flood control projects; without it, the control of floods would be impossible.

We must conclude, on the basis of all the facts, that the United States is not

equitably responsible for the plaintiffs' damages, since it is in no way at fault.

This opinion, together with the findings of fact which follow, will be certified to the Congress pursuant to House Resolution No. 475, 83d Congress, 2d Session.

It is so ordered.

BARKSDALE, District Judge, sitting by designation, JONES, Chief Judge and LARAMORE and MADDEN, Judges, concur.